# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) Case No. 1:22MJ426-1 |
| THE PREMISES LOCATED AT 111 POMONA DRIVE., SUITE B, GREENSBORO, NC 27407 | ) ) ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____MIDDLE_____ District of _____NORTH CAROLINA_____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 922(a)(1)(A) | Dealing and Manufacturing Firearms |
| 18 USC 933(a)(1) and (b) | Trafficking in Firearms |
| 18 USC 922(d) | Providing Firearms/ Ammunition to a Prohibited Person |

The application is based on these facts:
See Attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/ Michael B. Newsome
_____
*Applicant's signature*

Michael B. Newsome, SPECIAL AGENT, ATF
_____
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: _____10/28/2022    8:15 am_____

_____
*Judge's signature*

City and state: Durham, North Carolina

Hon. Joe L. Webster, U.S. Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF THE PREMISES LOCATED AT 111 POMONA DR., SUITE B, GREENSBORO, NORTH CAROLINA 27407 | Case No. 1:22MJ426-1 <br><br> **Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Michael B. Newsome, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been since May 2017.  I am currently assigned to the Charlotte Field Division, Greensboro I Field Office.  I am a graduate of the Federal Law Enforcement Training Center ("FLETC") Criminal Investigator Training Program, as well as the ATF National Academy, where I received extensive training in the investigation of firearms, controlled substances, arson, and explosives offenses.   Prior to my career with ATF, I worked for the Rocky Mount Police Department in North Carolina for approximately nine and a half years.  During my tenure with the Rocky Mount Police Department, I served as a duly sworn Task Force Officer with ATF from 2014 – 2017.  I am a graduate of North Carolina State University, as of 2007, with a Bachelor of Arts Degree in Criminology.

2.      During my career in law enforcement, I have conducted and participated in numerous complex case investigations involving federal and state firearms and controlled substance violations.  In furtherance of these investigations, I have utilized multiple investigative techniques including but not limited to physical and electronic surveillance, controlled purchases of evidence, management of confidential informants, forensic examination of electronic devices,

and the seizure of electronically stored communications. I have experience monitoring and gathering information received from court ordered interception of wire and electronic communication, pen register and/or trap and trace device, real time GPS and geo-location information, historical call detail records, and vehicle GPS monitoring. I have participated in the execution of numerous search warrants authorizing the seizure of evidence in criminal investigations. Through this experience, I have been able to successfully gather criminal intelligence and utilize this information in furtherance of ongoing criminal investigations.

3.      Based on my training, knowledge, and experience, I have become familiar with the following: (1) the manner in which firearms traffickers (a) transport, store, and distribute firearms, and (b) collect, keep, and conceal the proceeds of their illegal activities; and (2) the ways in which firearms traffickers use cellular telephones, electronic communications, internet service providers, social media, coded communications or slang during telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

4.      Additionally, through my training and experience, my conversations with other agents, and my participation in firearms trafficking investigations, I am aware that:

      a)   Firearms trafficking is an ongoing and recurring criminal activity. As contrasted with crimes against persons, which tend to be discrete offenses, firearms trafficking is an illegal commercial business that is characterized by regular, repeated criminal activity.

      b)   Cellular telephones are an indispensable tool of the firearms trafficking trade. Firearms traffickers use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, internet service providers, social

2

media, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators, associates, and customers.

c) Firearms traffickers keep and maintain records of their various activities. Such records are regularly concealed in a suspect's automobile, residence, office, in electronic accounts, and on their phones or computers, and the records take various forms. Documents commonly concealed by traffickers, include but are not limited to, notes in code, deposit slips, wired money transactions, hidden bank accounts, photographs of co-conspirators, various forms of commercial paper, personal address books, notebooks, records, receipts, ledgers, travel receipts (rental receipts, airline tickets, bus tickets, and/or train tickets) both commercial and private, money orders and other papers relating to the ordering, transportation, sale and distribution of firearms or other such documents which will contain identifying data on co-conspirators.

d) Firearms traffickers use cellular telephones, computers, electronic storage media, smart phones, physical and virtual servers through the Internet, cloud-based services, social media, and other electronic communications devices to facilitate illegal firearms transactions. The electronically stored information on these devices and servers is of evidentiary value in identifying other members of the firearm trafficking organization and establishing the relationship between these individuals and other identifying information stored on these devices.

3

e) Firearms traffickers providing/selling firearms and ammunition to prohibited persons, including but not limited to convicted felons, often do so only with individuals they know personally or have known personally over a period of time.

f) These relationships sometimes serve as a way to connect firearms traffickers with additional customers who are also prohibited persons for the purpose of selling firearms and ammunition. These types of relationships are close knit and based on trust that is developed over time through common ideologies and shared experiences.

i) Firearms traffickers will sometimes transition to manufacturing and selling privately made firearms, also known as "ghost guns", which are untraceable by law enforcement, in an effort to avoid detection and thwart investigations.

5.      The facts set forth in this affidavit are based upon my personal knowledge of this investigation, conversations with law enforcement officers and other individuals who have personal knowledge of the events and circumstances described herein, review of reports, documents, and recordings created by others, as well as information that I gained through training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.      Based on my training and experience and the facts as set forth in this affidavit, I submit there is probable cause to believe that violations of Title 18 U.S.C. § 922(a)(1)(A) [Dealing and Manufacturing Firearms without a License], Title 18 U.S.C. §933(a)(1) and (b)[ Trafficking in Firearms], andTitle 18 U.S.C. § 922(d) [Providing Firearms/Ammunition to a Prohibited Person] have been committed by Gregory Vince RACHAL and William Thomas CAPPS. There

4

is also probable cause to search the property described in Attachment A for evidence of these crimes further described in Attachment B.

## TECHNICAL BACKGROUND

### *Definition of a "Firearm"*

7.     As defined by Title 18 U.S.C. § 921(a)(3), the term **"firearm"** means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm.

### *Definition of Frame or Receiver*

8.     As defined by 27 CFR 478.12, the term **"frame"** means that part of a handgun, or variants thereof, that provides housing or a structure for the primary energized component designed to hold back the hammer, striker, bolt, or similar component prior to initiation of the firing sequence (i.e., sear or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.

9.     The term **"receiver"** means that part of a rifle, shotgun, or projectile weapon other than a handgun, or variants thereof, that provides housing or a structure for the primary component designed to block or seal the breech prior to initiation of the firing sequence (i.e., bolt, breechblock, or equivalent), even if pins or other attachments are required to connect such component to the housing or structure.

10.     The terms **"variant"** and **"variants thereof"** mean a weapon utilizing a similar frame or receiver design irrespective of new or different model designations or configurations, characteristics, features, components, accessories, or attachments. For example, an AK-type

5

firearm with a short stock and a pistol grip is a pistol variant of an AK-type rifle, an AR-type firearm with a short stock and a pistol grip is a pistol variant of an AR-type rifle, and a revolving cylinder shotgun is a shotgun variant of a revolver.

***Basic Firearm Nomenclature (AR-Style Rifle)***

      11.    Image 1 is a stock photograph of an AR-style rifle unrelated to this investigation. Although a rifle consists of many parts, I have labeled six basic parts of this rifle for educational and reference purposes.

Image 1 (unrelated to this case)



      12.    Image 2 depicts a disassembled AR-style rifle. This AR-style rifle is slightly different than the above image. This image has been utilized to further isolate the individual parts of an AR-style rifle. This firearm is also unrelated to this investigation.

6

Image 2 (unrelated to this case)



13.     Most firearm parts (i.e., stocks, barrels, triggers, magazines, etc.) are not subject to

ATF regulation. These parts are often made and sold by individuals, small businesses, and/or well-

known retailers. They are sold in store or online with almost no parameters. These firearm parts

can be bought and sold without sales reporting or background checks. However, the lower receiver

of a rifle or an AR-style pistol is different. As discussed in paragraph 7, a lower receiver is a

"firearm" and is regulated as such. Meaning, the ATF regulates and controls the lower receiver

alone just like a completed firearm. This also means the ATF regulates the manufacture, sale,

transfer, and disposition of lower receivers. Image 3 depicts a lower receiver for an AR-style rifle.

Image 3 (unrelated to this case)

Case 1:22-mj-00426-JLW   Document 1   Filed 10/28/22   Page 8 of 43



***"80%," "Unfinished," "Receiver Blanks," "Polymer 80," etc. – Lower Receivers***

14.     To manufacture an AR-style lower receiver, a manufacturer may start with a "blank receiver" or an "80% lower receiver." These are two terms used to refer to a metal or polymer casting that is approximately 80% of a completed lower receiver. The metal casting eventually becomes a finished lower receiver through a manufacturing process. The receiver is considered a "firearm" once that process is complete. Until that point, "80% receivers" or "blank receivers" are not considered "firearms" and "80% receivers" and/or "blank receivers" are currently unregulated.

15.     Through my training and experience, I know that an "unfinished" lower receiver can be converted into a completed lower receiver through the use of specialized tools like a drill press, a computer numerical control machine ("CNC machine"), and/or other precision measurement equipment. A CNC machine is an automated version of a drill press that is run by a computer, while a drill press is operated by hand. To complete an "unfinished" lower receiver, the manufacturer drills, cuts, or mills cavities in specific predetermined locations on the lower receiver using the specialized tools. For demonstrative purposes, compare the "unfinished" lower receiver (Image 4(a) to the "finished" lower receiver (Image 4(b)). The manufacturing process transforms the "80% receiver" into a finished lower receiver (a firearm) by creating the precise shape and space necessary for the lower receiver to accept the parts that will allow the firing of a projectile. The parts (i.e., the hammer, bolt/ breechblock, and firing mechanism) are the internal

8

mechanical parts, that combine with a trigger, firing pin, and other components to form a functioning firearm. These shapes or cavities must be created to the exact specifications required. If these cavities are not formed to the exact specifications required, the firearm may not function or may break upon use. This manufacturing process also creates the holes necessary to attach the upper receiver and barrel to the lower receiver. Image 4(c) shows a top view of a completed lower receiver for perspective. It should be noted that Image 4(a), Image 4(b), and Image 4(c) are not related to this case and are stock images being used solely for educational purposes.

Image 4(a)                     Image 4(b)



Image 4(c)

16.     According to ATF's official website, "Receiver blanks that do not meet the definition of a "firearm" are not subject to regulation under the Gun Control Act (GCA). ATF has long held that items such as receiver blanks, "castings" or "machined bodies" in which the fire-control cavity area is completely solid and un-machined have not reached the "stage of

9

manufacture" which would result in the classification of a firearm according to the GCA. The following three photos (Image 5) are provided as examples. The first receiver has a solid, un-machined fire-control cavity area with no holes or dimples for the selector, trigger, or hammer pins. It does not meet the GCA definition of a firearm. The second receiver, shown from the top, likewise has a solid, un-machined fire-control cavity area. It does not meet the GCA definition of a firearm. The third receiver has a partially machined fire-control cavity and does meet the GCA definition of a firearm."

Image 5 (from atf.gov)



*Basic Firearm Nomenclature (Semiautomatic Pistols)*

17.     Image 6 is a stock photograph of a Glock 19 semiautomatic pistol unrelated to this investigation. The Glock 19 pistol is the service weapon carried by ATF agents during their regular

course of duty and has been selected as an example to help illustrate the basic parts of a semiautomatic pistol.

Image 6 (unrelated to this case)



18.    Image 7 depicts a disassembled Glock 19 pistol unrelated to this investigation. This image is being utilized to further isolate the individual parts of a semiautomatic pistol for educational purposes and reference.

Image 7 (unrelated to this case)



19.     Pistol parts, such as slides, triggers, barrels, magazines, etc. are not subject to ATF regulation. These parts are widely available from a variety of retailers. However, as outlined in paragraph 7, the pistol frame is viewed differently than common gun parts and components and the "frame" is defined as a firearm. Thus, the ATF regulates the manufacture, sale, transfer, and disposition of a pistol frame. Depicted below within Image 8(a) and Image 8(b) are two frame types for semiautomatic pistols.

Image 8(a) (unrelated to this case)                    Image 8(b) (unrelated to this case)

     

*"80% Pistol Frame", "Polymer 80", "P80", etc. -  Pistol Frames*

13

20.     Just like the 80% lower receiver of an AR-style rifle, a person/manufacturer can start with a "blank" or "80% pistol frame" and complete the remaining part of the manufacturing process to finish the frame and assemble a functioning firearm from unregulated parts. Through my training and experience, I know that unfinished frames are manufactured into completed firearms using specialized tools, templates, jigs, drill presses, and/or a CNC machine. The manufacturing process transforms the "80% frame" into a finished frame (a firearm) by creating the precise shape and necessary pin holes for the frame to accept the parts needed for firing of a projectile.

### *Receiver/Frame Manufacturing cont.*

21.     Image 9(a), Image 9(b), Image 9(c), and Image 9(d), have been included to show an example of a manufacturing process to finish a firearm frame or receiver. It should be noted that these images only show one step of a manufacturing process. These images have been obtained from publicly available, online sources. These images are unrelated to this case and are solely being used for demonstrative purposes.

Image 9(a)                                    Image 9(b)

    

Image 9(c)                                    Image 9(d)

14



22.     This investigation deals with the manufacturing of pistol frames and the selling of completed firearms from acquired parts. In this case, it is suspected that RACHAL purchases 80% frames (unregulated, polymer castings) which are then manufactured into completed pistols frames (regulated firearms) by CAPPS. CAPPS then assembles fully functional/operational pistols (regulated firearms) from acquired parts which are then sold by RACHAL. These firearms are completely untraceable unlike a firearm made by a licensed manufacturer. The firearms built by RACHAL and CAPPS have no serial numbers or manufacturer identification markings. These firearms are known to ATF as "Privately Made Firearms." These Privately Made Firearms are sometimes referred to as "Ghost Guns" because they have no identification markings and are untraceable by law enforcement.

***Privately Made Firearm (PMF)***

23.     A PMF is defined by ATF as "a firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced. The term shall not include a firearm identified and registered in the National Firearms Registration and Transfer Record pursuant to Chapter 53, Title 26, United States Code, or any firearm manufactured or made before October 22, 1968 (unless remanufactured after that date).

15

*Federal Firearms License (FFL)*

24.     A person who manufactures and sells firearms is required to hold a federal firearms license ("FFL") in accordance with Title 18 U.S.C. § 923(a). As an FFL, the licensee is required to mark the firearms the FFL manufactures in accordance with Title 18 U.S.C. § 923(i) and its implementing regulation at 27 C.F.R. § 478.92, which prescribes the identifying markings (including serial number and manufacturer name) and the way each firearm is to be marked. Additionally, Title 18 U.S.C. § 923(g)(1)(A) and its implementing regulation at 27 C.F.R. § 478.123 prescribe record keeping requirements to ensure the licensee records specified information regarding the firearms' place of manufacture and the information to whom the firearms are transferred.

25.     Upon transfer of a firearm to a person who does not hold an FFL, the licensee transferring the firearm is required to complete a Firearms Transaction Record (ATF Form 4473) and initiate a background check on the non-licensed individual in accordance with Title 18 U.S.C. § 923(g)(1)(A) and Title 18 U.S.C. § 922(t) and their implementing regulations at 27 C.F.R. §§ 478.124 and 478.102.

26.     Individuals are permitted to manufacture a firearm for personal use without first obtaining a FFL, provided the firearm is not for sale and the person who made the firearm is not otherwise prohibited from possessing firearms. The requirement to hold a license when manufacturing and/or selling firearms applies to any person who is engaging in the business of manufacturing and/or selling firearms. Thus, only an FFL can manufacture a firearm for sale or transfer.

16

## PROBABLE CAUSE

### Case Initiation

27.     Beginning in June of 2020, the ATF Greensboro Field Office was contacted by the Guilford County Sheriff's Office (GCSO) regarding a large quantity of firearms that were being acquired by Gregory Vince RACHAL ("RACHAL") at AP Arms, a Federal Firearms Licensee ("FFL") located at 2823-J Spring Garden St., Greensboro, North Carolina.  This information was derived from multiple sale reports[1] that had been completed by AP Arms and forwarded to the GCSO and ATF following transactions with RACHAL.  A review of these records revealed that between April 2020 and August 2020, RACHAL acquired at least forty-six (46) handguns from AP Arms during multiple sale transactions.

28.     Further inspection of the multiple sale reports revealed that RACHAL had purchased many firearms of the same manufacturer, model, and caliber during this time frame.  On multiple occasions, RACHAL acquired identical firearms during the same transaction.  Based upon my training and experience, this can sometimes be an indicator of an individual who is acquiring firearms with the intention of re-selling them for profit.

29.     After reviewing the multiple sale reports, I queried records of the ATF National Tracing Center to see if any of the firearms acquired by RACHAL had been seized and traced by

---

[1] **ATF Form 3310.4, Report of Multiple Sale or Other Disposition of Pistols and Revolvers,** is required to be completed by Federal Firearms Licensees to report all transactions in which an unlicensed person acquired any combination of two or more pistols or revolvers during a five consecutive business day period

17

law enforcement agencies. At the time this query was conducted, I was unable to locate any firearms purchased by RACHAL which had been recovered and traced by law enforcement.

<u>First Interview with Gregory Rachal</u>

30.     On September 2, 2020, GCSO Detective Stacey Jarrell and I decided to attempt a voluntary interview with RACHAL to gather additional information about the large number of firearms he had acquired. I contacted RACHAL by telephone and asked if he would be willing to participate in the interview. RACHAL agreed to be interviewed and invited me to his place of business, POPS Electric, LLC, a local electrical company located at 111 Pomona Dr., Suite A, Greensboro, North Carolina ("NC"). The business website identifies RACHAL as the company president.

31.     Upon arrival, Detective Jarrell and I were greeted by RACHAL and invited into his office. I began the interview by explaining to RACHAL that we had identified a large number of firearms that he had recently acquired from AP Arms. RACHAL immediately began questioning me about the requirement to obtain a FFL in order to sell firearms. I explained to RACHAL that in order to engage in the business of dealing firearms, he would be required to obtain his FFL. I also informed RACHAL that by failing to obtain his FFL, he would be in violation of Title 18 U.S.C. § 922(a)(1)(a).

32.     RACHAL continued to ask additional questions regarding "private party" transactions and selling firearms from his "private collection". It was apparent from our conversation that RACHAL had made some attempt to determine whether or not he was required to obtain a FFL in order to sell firearms. I further explained to RACHAL that if he was purchasing firearms with the intention of re-selling them for profit, then he was engaging in the business of dealing firearms which would require him to obtain a FFL. RACHAL stated that he had previously

18

obtained a FFL application packet, but did not fill it out because he was unsure if he was required to have one or not.

33.    As the interview progressed, RACHAL admitted that many of the firearms he had acquired had been sold to other individuals. RACHAL acknowledged that prices of firearms had skyrocketed during the Covid-19 pandemic and stated that it was a "good time to be in the gun business". I informed RACHAL that he was in violation of federal law, and that he needed to obtain his FFL. RACHAL acknowledged that he understood and advised that he would no longer sell firearms.

34.    After conducting this interview with RACHAL, I continued to query records of the ATF National Tracing Center for multiple sale reports. I located three (3) additional reports from AP Arms detailing transactions which occurred after our interview on September 2, 2020. These reports indicated that RACHAL acquired three (3) firearms on September 3, 2020, four (4) firearms on September 8, 2020, and one (1) firearm on September 11, 2020.

35.    I also continued to query records of the ATF National Tracing Center for any firearms that had been seized and traced by law enforcement which had been originally purchased by RACHAL. Beginning in November 2020, I began to receive notification of multiple recoveries of RACHAL's firearms. While the majority of these recoveries occurred in NC, there were also recoveries in other states to include seven (7) firearms in Pennsylvania ("PA"), one (1) in Virginia ("VA"), and one (1) in Florida ("FL"). Based upon records maintained by the ATF National

19

Tracing Center, twenty-seven (27) of RACHAL's firearms have been recovered and traced by law enforcement to date.

<u>Transition to Privately Made Firearms</u>

36.     In January of 2021, officers with the Greensboro Police Department ("GPD") contacted the ATF Greensboro Field Office and advised they had identified a confidential human source ("CHS"), hereinafter referred to as CHS-1, who wished to provide information on RACHAL. CHS-1 was developed during a separate investigation conducted by the GPD. During GPD's investigation, they discovered that CHS-1 possessed information on RACHAL. CHS-1 agreed to meet with ATF on January 25, 2022, to share this information. The following is a synopsis of the information provided by CHS-1.

37.     CHS-1 began by identifying a photograph of RACHAL as the individual known to him as "POPS". CHS-1 met RACHAL through business dealings at POPS Electric. CHS-1 stated that RACHAL also has a tactical supply store located in the suite directly beside POPS Electric. CHS-1 advised that RACHAL sells ammunition, tactical gear, and firearm parts from the tactical supply store. CHS-1 frequently purchased ammunition from RACHAL at this location.

38.     CHS-1 indicated that sometime around November 2020, RACHAL informed CHS-1 that he had an offsite location where he was manufacturing privately made firearms ("PMFs"), commonly referred to as "ghost guns". CHS-1 had seen these PMF kits in RACHAL's store in the past but had never seen a completed firearm for sale. RACHAL offered to sell CHS-1 a PMF; however, CHS-1 declined to purchase the PMF in fear of getting into trouble.

39.     Following this interview, I responded to 111 Pomona Dr., Greensboro, NC to confirm that RACHAL had opened a tactical supply store next to his electrical supply business. I

20

observed that there was a new sign above Suite B which read, "POPS Tactical Supply, LLC". I had not observed this sign during my initial interview with RACHAL on September 2, 2020.

40.     I also had RACHAL's information queried through the ATF Federal Licensing System to determine if he had obtained his FFL. I confirmed that there were no licenses associated with RACHAL or POPS Tactical Supply, LLC which would allow him to manufacture, deal, or import firearms.

41.     Over the course of the next several months, I continued to track and monitor the recovery of RACHAL's firearms in multiple jurisdictions.

### ATF Philadelphia Group VII Investigation

42.     In August 2021, I was contacted by Special Agent ("SA") Robert Wise of the ATF Philadelphia Group VII Field Office. SA Wise advised that they had identified a possible connection between RACHAL and the recovery of his firearms in PA. Specifically, SA Wise advised that Philadelphia Group VII agents had obtained a search warrant related to the iCloud account of a suspected firearms trafficker from Philadelphia. During a review of these records, agents had located photographs of several firearms. Metadata associated with these images indicated that the files were created on or about August 21, 2020, in Greensboro, NC. Coincidentally, RACHAL had acquired many of these same firearms during a multiple sale at AP Arms on August 20, 2020, the day before the images were created.

43.     SA Wise had also obtained the firearms trafficker's call detail records. A review of these records revealed that the trafficker had previously been in communication with two (2) cellular telephone numbers from the Greensboro area. SA Wise queried the numbers through law enforcement intelligence databases for names of individuals that had been previously associated

21

with these numbers. One of the individuals identified by SA Wise will hereinafter be referred to as "DE".

44. By reviewing trace report data, I was able to confirm that one of RACHAL's firearms, a Bond Arms .45/410 caliber derringer, had been previously seized from DE by the GPD on January 8, 2021. I also confirmed that a PMF was seized from DE by the GPD one month later on February 7, 2021. A criminal history inquiry revealed that on September 10, 2021, DE ultimately pled guilty to Possession of a Firearm by a Convicted Felon in relation to these offenses and received a 12-24 month suspended sentence.

Analysis of Call Detail Records

45. On September 3, 2021, Verizon Wireless was served with a federal grand jury subpoena for call detail records without cell site information related to two (2) mobile telephone numbers believed to be maintained by RACHAL, 336-215-9318 and 336-345-0863. The subscriber information provided by Verizon Wireless confirmed that both numbers were maintained by RACHAL under his business name. The records were provided to ATF Intelligence Research Specialist (IRS) Stacy Foster for analysis. IRS Foster examined the call detail records for evidence of communication between RACHAL and DE. IRS Foster identified over seventy-five (75) contacts between RACHAL and DE from September 2020 through June 2021[2].

Interview with DE

46. On September 21, 2021, I met with DE at the Guilford County Probation Office in Greensboro, NC following a meeting with his probation officer. DE voluntarily agreed to speak

---

[2] Call Detail Records provided by Verizon Wireless only dated back to September 2020

with me about the investigation of RACHAL. The following is a synopsis of the information provided by DE during this interview.

47. DE identified a photograph of RACHAL as the person known to him as "POPS". DE met RACHAL in 2020 when RACHAL's company was hired to perform electrical repairs for DE's mother. While dealing with RACHAL during these repairs, DE learned that RACHAL also sold firearms at his business.

48. RACHAL offered to sell firearms to DE not long after they met. DE informed RACHAL that he was a convicted felon and was prohibited from possessing firearms. According to DE, RACHAL did not care that he was a convicted felon and offered to sell him firearms anyway.

49. DE admitted that he had purchased numerous firearms from RACHAL over the past year. DE stated that he acted as a "middle-man" for the majority of these transactions and brokered the deals for other individuals. DE stated that RACHAL had quit selling serialized weapons and was now only selling PMFs because they were untraceable by law enforcement. DE admitted that the Bond Arms .45/410 caliber derringer as well as the PMF that had been seized from him by the GPD were both obtained from RACHAL.

50. DE quit dealing with RACHAL during the summer of 2021 because he wanted to stay out of trouble with law enforcement. After he quit purchasing firearms, RACHAL asked for DE to send some of his customers to him. DE provided a text message received from RACHAL

23

to corroborate this information. The text message, dated August 18, 2021, read as follows: *"Hey since you are out of the game, can you send someone else to us, we need to move some items."*

<u>Second Interview with Gregory Rachal</u>

51.     On December 14, 2021, ATF SA Shaun Hunter and Task Force Officer ("TFO") Nick Harvey conducted a follow up investigation on a Glock 9mm handgun which was recovered in Thomasville, NC on December 6, 2021. A trace of the firearm revealed that it had been originally purchased by RACHAL on August 7, 2020.

52.     Unaware of my investigation, SA Hunter and TFO Harvey responded to POPS Tactical Supply to conduct an interview with RACHAL about the recovery of this firearm. RACHAL invited the agents inside his office and voluntarily agreed to participate in the interview. The following is a synopsis of the information provided by RACHAL during the interview.

53.     RACHAL admitted that he began selling firearms in March of 2020. RACHAL admitted that the firearms he acquired were resold for profit. RACHAL indicated that at that time, he did not believe what he was doing was illegal because all of the firearms were in his name, not his company's name.

54.     RACHAL acknowledged that he had been warned by ATF in the latter part of 2020 about selling firearms without first obtaining his FFL. RACHAL admitted that he had continued to sell a few firearms following this warning. RACHAL advised that he obtained his FFL application but never completed the process. RACHAL stated that now he sells Polymer80 kits which customers can purchase to build their own PMFs; however, he does not sell completed firearms. RACHAL acknowledged that PMFs are unique because they are untraceable by law

24

enforcement and no documentation is required, which makes them sought after by criminals and those who cannot obtain firearms through legal markets.

55.     During the interview, RACHAL repeatedly referred to a spreadsheet on his office computer. RACHAL advised that the spreadsheet was used to maintain record of all of his firearm transactions. RACHAL agreed to provide this spreadsheet to SA Hunter. Further review of the spreadsheet revealed that RACHAL had kept detailed acquisition and disposition records for every serialized firearm he had purchased and resold. The spreadsheet indicated that RACHAL had acquired over two hundred (200) serialized firearms between March 2020 and January 2021. RACHAL had documented how much he had invested in each firearm as well as how much he had sold the firearms for. Based upon RACHAL's own records, almost all of these firearms had been resold for profit. The records also reflected that RACHAL had sold over thirty (30) serialized firearms following his initial warning on September 2, 2020.[3]

56.     SA Hunter warned RACHAL once again that he had been dealing firearms without a license, and that he had also committed a federal offense every time he indicated on an ATF Form 4473 that he was the actual purchaser or transferee of a firearm when he was, in fact, purchasing the firearm to be resold to another individual. RACHAL indicated that he understood and reiterated that he was no longer selling any firearms.

Controlled Purchases of PMFs from Gregory Rachal

57.     During this investigation, ATF has developed a CHS, hereinafter referred to as CHS-2, who has agreed to provide assistance with the investigation of RACHAL. CHS-2 has provided information on numerous occasions which has been corroborated and proven reliable.

---

[3] There were no transactions involving Privately Made Firearms represented on the spreadsheet maintained by RACHAL

CHS-2 has indicated that he has purchased numerous serialized firearms as well as PMFs from RACHAL since 2020. This information has been corroborated by the spreadsheet that RACHAL turned over to ATF in December 2021. It should be noted that CHS-2 has been previously convicted of a crime punishable by a term of imprisonment exceeding one year and is prohibited from possessing firearms and ammunition. CHS-2 advised that he has informed RACHAL of his status as a prohibited person.

58.     CHS-2 stated that RACHAL began selling PMFs at POPS Tactical Supply in an effort to avoid to detection by law enforcement. CHS-2 identified William Thomas CAPPS ("CAPPS") aka "Tommy" as one of RACHAL's employees. CHS-2 has identified CAPPS as the person who manufactures the PMFs for RACHAL to sell. CHS-2 stated that RACHAL purchases all the parts kits which are then manufactured and assembled into functioning firearms by CAPPS to make them ready for distribution.

59.     CHS-2 stated that CAPPS told him about RACHAL being warned by ATF in 2020 as well as 2021. CAPPS also warned CHS-2 about the spreadsheet RACHAL turned over to ATF in December 2021 which contained CHS-2's name. CHS-2 stated that RACHAL and CAPPS were worried about being arrested by ATF after RACHAL turned over the spreadsheet and decided to quit selling PMFs for several months.

60.     In July of 2022, CHS-2 advised that CAPPS informed him that RACHAL had begun selling PMFs at POPS Tactical Supply once again despite his warnings from ATF. In furtherance of the investigation, CHS-2 agreed to make controlled purchases of PMFs from RACHAL at the direction of ATF.

61.     On August 3, 2022, CHS-2 was utilized to make the first controlled purchase of a PMF from RACHAL. This transaction occurred at POPS Tactical Supply, 111 Pomona Dr., Suite

B, Greensboro, NC. RACHAL sold CHS-2 a privately made 9mm pistol with no serial number for $515.00. In addition to the PMF, RACHAL also sold CHS-2 a compatible laser sight, holster, and two (2) boxes of 9mm ammunition. The total purchase price for all of the items was $675.00.

62.     The PMF was not on public display inside the business. RACHAL retrieved the PMF from a gun safe located in the back of the business. RACHAL provided CHS-2 with an itemized invoice for this purchase. RACHAL represented the PMF as three (3) separate items on the invoice as follows: "*Glock 43 Complete Upper, Polymer 80 PF9SS 80% Frame FDE, Glock 43 Lower Parts Kit*".

63.     During the transaction, RACHAL asked CHS-2 multiple times if he had ever been contacted by the police or the ATF. This appears to be a reference to RACHAL knowing that CHS-2's name was listed on the spreadsheet that he had turned over to SA Hunter in December 2021. CHS-2 denied being contacted by law enforcement and insinuated that he would be in jail if law enforcement would have approached him. RACHAL also asked CHS-2 if he was still wearing an ankle monitor, which indicates that RACHAL had knowledge of CHS-2 prior arrests by law enforcement.

64.     After selling the firearm, RACHAL told CHS-2 to talk to CAPPS and see if he was willing to manufacture additional PMFs. RACHAL indicated that he could provide CAPPS with the parts if he was willing to complete the firearms. Following the transaction, CHS-2 made a consensual recorded call to CAPPS at the direction of ATF. During this call, CAPPS agreed to manufacture additional pistols for CHS-2.

65.     On August 8, 2022, CHS-2 advised that CAPPS had instructed him to go purchase the necessary parts to complete the PMFs he wanted at POPS Tactical Supply and leave them at

27

the store. CAPPS agreed to manufacture the PMFs and let CHS-2 know when they were ready to be picked up.

66.     On August 9, 2022, CHS-2 conducted another controlled purchase from RACHAL at POPS Tactical Supply. CHS-2 purchased all the parts necessary for CAPPS to manufacture two (2) 9mm pistols. The total purchase price for these parts was $1,100.00. CAPPS was also present during this transaction. RACHAL placed the parts in a box and showed CAPPS where they would be kept until he had time to manufacture them.

67.     During this transaction, RACHAL showed CHS-2 a letter that he had received from the Charlotte-Mecklenburg Police Department ("CMPD") notifying him of the recovery of one of his firearms in Charlotte, NC. RACHAL stated that a female had shot herself with the firearm. RACHAL stated that it was one of the firearms CHS-2 had purchased from him. RACHAL implied that CHS-2 must have sold this firearm to the female in Charlotte.

68.     It should be noted that this firearm is highlighted in red on the spreadsheet RACHAL turned over to SA Hunter. I have previously reviewed reports from CMPD detailing the recovery of RACHAL's firearms and his subsequent statement to a CMPD detective. I have also spoken to the detective who made contact with RACHAL following these recoveries. Contrary to what he told CHS-2, RACHAL advised CMPD detectives that he had discovered multiple firearms missing from his tactical bags and that they were most likely stolen from his vehicle while he was visiting Bass Pro Shops in Concord, NC. RACHAL had not reported any of these firearms stolen.

69.     On August 12, 2022, CHS-2 advised that CAPPS had called him and said the PMFs had been completed and were ready to be picked up from POPS Tactical Supply. On August 15, 2022, CHS-2 picked up the two (2) 9mm pistols from RACHAL during a controlled operation at

28

POPS Tactical Supply. CHS-2 also purchased compatible laser sights for the PMFs for $100.00. CAPPS was also present during this transaction. CHS-2 walked to the back room to speak with CAPPS and found him manufacturing another PMF while the transaction occurred. Neither of the PMFs purchased by CHS-2 had been serialized. RACHAL provided CHS-2 with another itemized receipt in which he separated the PMFs into individual parts.

70.     On August 26, 2022, CHS-2 was utilized to conduct another controlled purchase of PMFs from RACHAL at POPS Tactical Supply. During this transaction, RACHAL walked to the gun safe in the back room and retrieved a privately made 9mm pistol to show CHS-2. CHS-2 agreed to purchase the pistol and inquired about purchasing a second one. RACHAL instructed CHS-2 to pick out an upper assembly that he liked from the display case. Once CHS-2 picked out a 9mm upper assembly, RACHAL walked back to the gun safe and retrieved a compatible frame to complete the pistol. CHS-2 purchased both pistols from RACHAL for $1,095.00. Neither of the 9mm pistols had been serialized. CHS-2 also purchased compatible thirty-one (31) round extended magazines, laser sights, and two (2) boxes of 9mm ammunition for the PMFs. The total purchase price for this transaction was $1,315.00.

71.     Prior to leaving the business, CHS-2 asked RACHAL for a box to place the items in. RACHAL responded by saying, *"Oh don't worry...you're not walking out holding that shit"*. RACHAL told CHS-2 to let him know if he needed more PMFs. RACHAL advised that they had approximately ten (10) PMFs completed and ready to be sold.

72.     On September 29, 2022, CHS-2 was utilized to conduct another controlled purchase from RACHAL at POPS Tactical Supply. RACHAL informed CHS-2 that he only had one (1) 9mm pistol ready for sale. RACHAL told CHS-2 that CAPPS was currently working on another 9mm pistol which would be completed later in the day. CHS-2 agreed to purchase both PMFs for

29

$1,100.00. CAPPS emerged from the rear of the business and provided CHS-2 with the completed PMF. CAPPS indicated that he would complete the second PMF after he returned from his lunch break. CHS-2 left the business with the completed PMF and advised that he would return at a later date to pick up the second one. The 9mm pistol purchased by CHS-2 during this operation had not been serialized.

73.     On October 5, 2022, CHS-2 returned to POPS Tactical Supply in a controlled operation to pick up the completed PMF that he had already paid for. CHS-2 also inquired about purchasing any additional PMFs that RACHAL had available. RACHAL indicated that he only had one (1) more 9mm pistol ready for sale. CHS-2 agreed to purchase this PMF as well for $550.00. Neither of the PMFs purchased by CHS-2 had been serialized.

74.     On October 26, 2022, CHS-2 was utilized to conduct another controlled purchase from RACHAL at POPS Tactical Supply. Both RACHAL and CAPPS were present during the transaction. RACHAL showed CHS-2 several additional firearms that he had for sale. CHS-2 purchased a privately made 9mm pistol from RACHAL for $600.00. The firearm had not been serialized. CHS-2 also purchased an extended magazine to accompany the PMF for $30.00.

75.     CHS-2 informed RACHAL that he had several people that wanted to purchase additional PMFs. RACHAL instructed CHS-2 to speak with CAPPS about manufacturing the PMFs. CAPPS agreed to manufacture four (4) additional pistols for CHS-2 to purchase in the coming days. RACHAL gave CHS-2 an estimate of $2,400.00 for the pistols.

Synopsis of Controlled Purchases

76.     Since August 3, 2022, CHS-2 has purchased a total of nine (9) PMFs from RACHAL during controlled operations at POPS Tactical Supply utilizing funds provided by the ATF. All of the PMFs, which are currently in the custody of the ATF, have been identified as

30

9mm pistols bearing no serial numbers or other identifiable markings which would make them traceable by law enforcement. All of the above referenced controlled purchases were captured utilizing covert, electronic surveillance equipment capable of recording audio and video. I have reviewed each of the recordings and positively identified RACHAL and CAPPS engaged in the activities described above.

77.     Throughout this investigation, I have consulted with ATF Industry Operations Investigators ("IOIs") on multiple occasions to have RACHAL and CAPPS queried through the ATF Federal Licensing System to determine if either has obtained their FFL. On each occasion, IOIs have been unable to locate any licenses associated with RACHAL, CAPPS, nor POPS Tactical Supply, LLC which would allow them to manufacture, deal, or import firearms.

## CONCLUSION

78.     Based on the aforementioned information, I respectfully submit that there is probable cause to believe that violations of Title 18 U.S.C. § 922(a)(1)(A) [Dealing and Manufacturing Firearms without a License], 18 U.S.C. §933(a)(1) and (b) [Trafficking in Firearms], and Title 18 U.S.C. § 922(d) [Providing a Firearm/Ammunition to a Prohibited Person] have been committed by Gregory Vince RACHAL and William Thomas CAPPS. I also submit there is probable cause to search the Target Location described in Attachment A for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in Attachment B.

79.     I submit that if phones, computers, or storage medium are found at the Target Location or in the possession of RACHAL or CAPPS, this Affidavit supports probable cause for authorizing the search of the devices for records which they may contain.

80.     Based on my knowledge, training, and experience, I know that phone and computer files or remnants of such files can be recovered months or even years after they have been

31

downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a phone or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

81.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space- that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a phone's or computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

82.    Wholly apart from user-generated files, phone and computer storage media—in particular, phones' and computers' internal hard drives—contain electronic evidence of how a phone or a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Phone and computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

83.    Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

84.    Based upon my training and experience, I know that phone and computer data can be stored on a variety of systems and storage devices, including external and internal hard drives, flash drives, thumb drives, micro SD cards, macro SD cards, DVDs, gaming systems, SIM cards,

32

cellular phones capable of storage, floppy disks, compact disks, magnetic tapes, memory cards, memory chips, and online or offsite storage servers maintained by corporations, including but not limited to cloud-based storage. I also know that during the search of the premises it is not always possible to search phone and computer equipment and storage devices for data for a number of reasons, including the following:

<ol type="a">
<li>Searching phone and computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of phones and computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of phone or computer, software application, or operating system that is being searched;</li>

<li>Searching phone and computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Phone and computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since phone and computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted;</li>
</ol>

33

c. The volume of data stored on many phone and computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

d. Phone and computer users can attempt to conceal data within phone and computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Phone and computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, phone and computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a phone or computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

85.     Based on my own experience and my consultation with other agents who have been involved in phone and computer searches, searching computerized information for contraband, evidence, fruits, or instrumentalities of a crime often requires the seizure of all of a phone's or computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords), so that a qualified computer

34

expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

a. The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices; and

b. In order to fully retrieve data from a computer system, the analyst also needs all magnetic storage devices, as well as the central processing unit (CPU). Further, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software that may have been used to create the data (whether stored on hard drives or on external media) for proper data retrieval.

**<u>PROCEDURES FOR UNLOCKING ENCRYPTED DEVICES</u>**

86. The search warrant requests authorization to use the biometric unlock features of a device (including phones and computers), based on the following, which I know from my training, experience, and review of publicly available materials:

35

a. Users may enable a biometric unlock function on some digital devices (including phones and computers). To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress RACHAL's or CAPPS' thumb and/or fingers on the device(s); and (2) hold the device(s) in front of RACHAL's or CAPPS' face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

Therefore, I request that the Court issue search warrants for the same.

## REVIEW

87.     Assistant United States Attorney Nicole R. DuPré has reviewed this affidavit.

Respectfully submitted,

*/s/ Michael B. Newsome*
Special Agent Michael B. Newsome
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit. This the 28th of October, 2022 at 8:15 a.m.

Honorable Joe L. Webster
United States Magistrate Judge
Middle District of North Carolina

37

## ATTACHMENT A

### Property to Be Searched

<u>111 Pomona Dr., Suite B, Greensboro, North Carolina 27407</u>

The Target Location is a commercial business located at 111 Pomona Dr., Suite B, Greensboro, NC 27407, within the Middle District of North Carolina. The words "POPS Tactical Supply LLC" are clearly displayed above the entrance. This includes any vehicles owned or operated by either Gregory RACHAL or William CAPPS if located at the target location at the time of execution of the warrant. The following is a photograph of the premises to be searched:



# ATTACHMENT B

## "Items to be seized"

The following materials, which constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, or property designed or intended for use or which is or has been used as the means of committing a criminal offense, namely, violations of Title 18 U.S.C. § 922(a)(1)(A) [Dealing and Manufacturing Firearms without a License], 18 U.S.C. §933(a)(1) and (b)[ Trafficking in Firearms], and Title 18 U.S.C. § 922(d) [Providing a Firearm/Ammunition to a Prohibited Person] in the form of the following:

a. Any firearm that does not have a lawful manufacturer stamp and/or serial number.

b. Any unregistered firearm (where registration is required by Title 26 of the United States Code), to include but not limited to short barrel rifles, silencers, Any Other Weapons, and machineguns.

c. Any firearms, including revolvers, pistols, rifles, shotguns, machineguns, silencers, and/or destructive devices, and/or ammunition as defined by Title 18, United States Code, Section 921(a)(3) and 921(a)(17) that can be marketed for sale or viewed as dealer inventory.

d. Any "unfinished", "80%", or "blank" frames or receivers of any kind and in any state of completion.

e. Any items pertaining to the possession, manufacture, or distribution of firearms, including but not limited to, lower receivers, upper receivers, grips, stocks, magazines, slides, firing pins, trigger assemblies, sights, and barrels for any type of firearms.

f. Any tools and/or equipment associated with the manufacture of firearms, including but not limited to drills, drill presses, lathes, welding equipment, jigs, hack saws, power saws,

2

templates, diagrams, instruction manuals, pamphlets, and/or other tutorial material regarding the manufacture of firearms.

g. Any computer numerical control ("CNC") machines and/or computers/parts/tools associated with the use and/or association of the manufacturing and/or modifying of firearms, firearm parts, frames/receivers (and firearm blanks of any kind) machineguns and/or machinegun parts including but not limited to templates, cutting programs, diagrams, instruction manuals, pamphlets, or other tutorial material regarding the manufacture of firearms.

h. Any items pertaining to the ownership or control of firearms, firearm parts, or firearm ammunition, including but not limited to; firearm transactions records relating to the receipt, purchase, transfer, possession, sale, or transportation of firearms; photographs and/or videos of firearms, firearm parts, and firearm ammunition; documents which relate or refer to firearms; bills of sale which relate to firearms; and receipts and/or invoices which relate to firearms.

i. Personal books, papers, and receipts reflecting names, addresses, telephone numbers, and other contact or identification data relating to the acquisition and/or distribution of firearms.

j. Personal tax statements, paycheck stubs, bank records, or other financial documents relating to personal income and the acquisition and/or purchasing of firearms, firearm components, firearm accessories, and firearm ammunition.

k. Receipts, invoices, notes, ledgers, bill-of-sales, and/or any record keeping documents relating to the acquisition and distribution of firearms or firearms parts, and/or tools or equipment associated with the manufacture of firearms.

3

l.  Evidence and record keeping documents relating to the accumulation of proceeds derived from illegal firearms trafficking and manufacturing.

m.  Shipping records, shipping containers and/or boxes, and invoices relating to the purchase or shipment of firearms.

n.  Customer and supplier information, including items identifying firearm customers and suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, invoices, mail, papers with telephone numbers and/or names and/or addresses, and similar items.

o.  United States currency greater than $2,000, including any and all financial records to facilitate the investigation of the laundering of illicitly obtained monies and/or other forms of assets, including United States currency acquired through the sales, trafficking, or manufacturing of firearms.

p.  Rental or lease agreements for storage units, safety deposit boxes, other storage locations, keys, combinations, and/or access codes for them.

q.  Indicia of occupancy, residency, and/or ownership of the premises, including, but not limited to: financial income statements, documents, utility bills, telephone bills, property receipts, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, escrow documents, statements, identification documents, keys, and bank account records.

r.  Any safes, vaults, locked cabinets, and/or other secured containers and/or devices at the locations and in/on vehicles on or within the premises. (Law enforcement shall be permitted to open such locked containers by force or by a locksmith if necessary).

s.  The contents of any surveillance camera or surveillance system on the premises that may have captured/recorded previous firearm transactions.

4

t. Any computer equipment or digital devices that are capable of being used to commit or further the crimes described in the attached affidavit, or to create, access or store evidence, contraband, fruits or instrumentalities of such crimes, including: central processing units, laptop or notebook computers, tablets, and wireless communication devices, including mobile telephones, cellphones, and smartphones.

`

5